UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
UNITED STATES OF AMERICA,       : 17-cr-00281(ERK)
                                :
                                :
    - versus -                  : U.S. Courthouse
                                : Brooklyn, New York
CARLOS MARTINEZ,                :
                                : April 13, 2022
                Defendant       : 3:19 p.m.
------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE EDWARD R. KORMAN
UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S:**


For the Government:      **Breon S. Peace, Esq.**
                         United States Attorney


                  BY:   **Nadia Shihata, Esq.**
                        **Elizabeth Geddes, Esq.**
                        Assistant U.S. Attorneys
                        271 Cadman Plaza East
                        Brooklyn, New York 11201


For the Defendant:       **Anthony L. Ricco, Esq.**
                         **Steven Z. Legon, Esq.**
                         20 Vesey Street, Suite 400
                         New York, NY 10007

                         **Carlos M. Santiago, Esq.**
                         The Law Office of
                          Carlos M. Santiago
                         11 Broadway, Suite 615
                         New York, NY 10004


Transcription Service:   **Transcriptions Plus II, Inc.**
                         61 Beatrice Avenue
                         West Islip, New York 11795
                         RL.Transcriptions2@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE CLERK:  We're on for Criminal Cause for

2   Sentencing in 17-cr-281, *The United States v. Carlos*

3   *Martinez*.

4          Counsel, please state your appearances for the

5   record.

6          MS. SHIHATA:  Good afternoon, your Honor.

7   Nadia Shihata and Elizabeth Geddes for the United States.

8          MR. RICCO:  Good afternoon, your Honor.

9   Anthony Ricco, Carlos Santiago, Steven Legon for Carlos

10   Martinez.

11          THE COURT:  Okay.  Well, I'm not sure whether

12   I'm going to sentence him or not, but you can call it

13   sentencing.  I just want to go through some of the legal

14   issues that have been raised so that we can get them

15   ironed out including God knows when I was getting emails

16   last night with submissions.

17          So how shall we organize this?  I guess there

18   are pending motions.  You moved for judgment of acquittal

19   and you've made other arguments.  Why don't you take the

20   lead?  I mean you want to take the lead?

21          MS. SHIHATA:  I'm just happy to answer your

22   questions and Mr. Ricco can of course correct me if I get

23   it wrong.  I don't believe any post trial motions on the

24   second trial were in fact filed so --

25          THE COURT:  I thought he was asking for the

3

Proceedings

1   paper that he filed not last night --

2           MS. SHIHATA:  I think he alluded to the fact

3   that maybe down the line he may choose to file something

4   but at this point my understanding is we're prepared to

5   proceed to sentencing and of course Mr. Ricco can --

6           THE COURT:  Maybe I didn't read it right.  Do I

7   have this?

8           MS. SHIHATA:  I have copies of everything.

9           THE COURT:  I should have copies too.  Do I

10  have his sentencing order?

11                  (Pause in proceedings)

12          THE COURT:  Or didn't mislay this document

13  which I'm talking the lawyer just sent me in April.

14  Where's the one before April 12th?  Is April 12th your

15  last and only filing in relation to this?

16          MR. RICCO:  Substantive, yes, Judge.

17          MS. SHIHATA:  There's one earlier one, Judge.

18  I think it's dated -- filed on I think it was October 1st

19  or September 30, 2021.  It's ECF docket number 129.

20          MR. RICCO:  Yes.  That's the defendant's

21  sentencing recommendation.  That's 129.  ECF document 130

22  is objections to the PSR.  The next substantive filing

23  would have been the filing on the evening of the 12th.

24          THE COURT:  Well that was yesterday.

25          MS. SHIHATA:  Yes, your Honor.

Proceedings

4

1          MR. RICCO:  Yes.

2          THE COURT:  But I thought I read something

3  before yesterday.  In fact, you responded to it and you

4  even threw in a line that said he had only until -- I

5  mean that --

6          MS. SHIHATA:  I'm sorry.

7          THE COURT:  You said it's too late because he

8  didn't file it by April 20th.

9          MS. SHIHATA:  Well also, he didn't file it.

10  There's a footnote or a sentence in the sentencing

11  recommendation that says something about that and the --

12          THE COURT:  Right.  And I need to see it.  I

13  mean I thought you said it was too late and I thought he

14  said something to indicate that it wouldn't have been too

15  late.  April 20, 2020 this court was for all practical

16  purposes in shutdown and it wasn't on for sentencing.  I

17  don't want to get involved if he hasn't moved.  But my

18  normal practice is invariably when a jury reaches a

19  guilty verdict, I give the defendant until the date of

20  sentencing to file any motions that have to be filed

21  within seven days of the verdict.  It's almost automatic.

22  But if he didn't move, he didn't move.  I thought I saw

23  it.

24          Okay.  So you haven't moved.  So what do you

25  want from me?

5

Proceedings

1      MR. RICCO:  Judge, we're prepared to go

2  forward.  The issues that we would have raised in the

3  motion have been preserved.  We had a sidebar about it.

4  Your Honor decided it was a legal issue and related to

5  the concept of whether or not a threat of force had to be

6  related to an exercise of force, not just a threat of

7  force.

8      THE COURT:  Look, the government has

9  unnecessarily complicated this case as they usually do.

10  There were five separate incidents involving sexual

11  contact and for each one they use four separate statutes.

12  And that sort of complicates it.  The one count, as I

13  view the verdict, the verdict was complicated by the fact

14  that there were two trials and probation used one

15  numbering and I think I had another one.  Do you have the

16  verdict sheet?  I'm just going to pull up the verdict

17  sheet that I gave to the jury because it's much easier

18  for me to deal with.

19      MS. SHIHATA:  To the extent it's helpful,

20  Judge, in the government's October 28 --

21      THE COURT:  It's not helpful the way you set it

22  out.  You gave me one set and then something on the

23  bottom of it.

24      MS. SHIHATA:  Just it shows the counts in both

25  the redacted indictment and the original.

6

Proceedings

1          THE COURT:  Yes, I know but I don't want it.

2          MS. SHIHATA:  Okay.  It's not helpful.  That's

3     fine.

4          THE COURT:  Just when I charged the jury I used

5     the verdict sheet that I gave them.  And when I went back

6     to see what I charged the jury, it was useful for me to

7     be able to use the verdict sheet I gave them.  Are you

8     going to be able to find it?  I got it.  Okay.

9          At the first trial the jury I believe convicted

10    the defendant of everything.  I set aside the verdict I

11    guess on all of the counts except what I would call the

12    count involving the --

13         MR. RICCO:  Ward?

14         MS. SHIHATA:  Sexual abuse of a ward, your

15    Honor?

16         THE COURT:  The ward, yes.  The sexual abuse of

17    the ward which was not an issue and was not affected by

18    the Brady material.

19         Of the counts that were submitted to the jury,

20    the deprivation of rights, which also coincides with the

21    aggravated special sexual abuse as it must because I

22    charged the jury that in order to find deprivation of

23    rights they ultimately have to find as one element

24    aggravated sexual abuse.  And so the verdict sheet is

25    consistent in that they found the defendant guilty on

7

                        Proceedings

1    count 4 which is deprivation of rights, count 5 which is

2    the aggravated special abuse which coincides with date.

3    And then they also found him guilty of sexual abuse on

4    one of the counts that did not involve penetration.  I'm

5    sorry, on one of the counts I think the second December

6    13, 2015 count only because they wanted to be consistent

7    all the way through.

8              But we're basically dealing with the same

9    element, the same critical element.  And I don't see how

10   I can set aside the jury verdict.  I don't say this is

11   not a troubling case which is why having tried the case

12   in 2019 I spent three of the last four days reading the

13   transcript.  And there are aspects of the case that are

14   troubling including the telephone call that she had, what

15   a telephone call -- the investigation, what I'll call the

16   Facebook investigation which leaves serious questions as

17   to its purpose in my own mind.  It seems to me that this

18   is a jury question.  I can't set the verdict aside under

19   the normal standards of government that govern the jury,

20   jury verdicts notwithstanding that I find they are

21   troubling aspects in this case.

22             So now the other counts don't matter to the

23   calculation of the guidelines.  They might matter if they

24   added anything to any of the guidelines in life where a

25   sentence within the guidelines would be relevant if the

8

Proceedings

1  jury had found him guilty of five counts of forcible

2  rape, which they didn't. And I regarded the verdicts on

3  counts 3 to 15 as really -- it seems to me it doesn't

4  apply to what was charged. I don't believe -- I believe

5  that as charged and as she testified, the victim, she did

6  not consent because she was threatened or because of

7  fear. Possibly she may not have recorded it for that

8  reason. But she didn't testify, and you can find it for

9  me if you can, where she testified that the reason for

10  her consent was fear or force. In fact, if you take a

11  look at your own letter which describes in some detail

12  her testimony, let me see if I have that, it was all

13  force. He just used force each time in order to have

14  sexual relations with her. It wasn't caused by anything

15  other than his physical strength and his ability to rape

16  her.

17         MS. SHIHATA: May I respond, your Honor?

18         THE COURT: Yes. What I'm saying is it may not

19  affect the guidelines but I don't think it adds -- that

20  is the guidelines would still be life when I say that.

21  And I'm not even sure that it affects what sentence

22  within the guideline range because it's all the same

23  basic conduct. But go ahead. Take a look at page 4 of

24  your letter.

25         MS. SHIHATA: Sorry, which of the letters?

9

Proceedings

1          THE COURT:  I think it's your letter of October

2    28, 2021.

3          MR. RICCO:  Okay.  So your Honor --

4          THE COURT:  These are all forcible rapes as you

5    described them.  In your opening statement you refer to

6    them that way.  Ms. Geddes was a little bit more subtle

7    and tried to work in fear and threats.  But to the

8    extent -- I don't recall that she testified that that was

9    the reason how she came to engage in that.  And I think

10   the statute, the only way the statute could be sensibly

11   read is it's a kind of forced consent, not by physical

12   force, but by threat of force.

13          In this case, if you read what you wrote, if

14   you read what you argued to the jury and what she

15   testified to, which is what you quote, on page 4 of your

16   letter you quote all the evidence, this was simply a

17   case, if you believe the testimony, where he physically

18   raped her.  That's sort of the way I view those counts.

19          I don't know whether anybody thinks when they

20   draft an indictment about how the case is going to be

21   presented and what problems it's going to entail

22   particularly with a witness like this one.  But that's

23   sort of my view of it.

24          So you know, for the purpose of sentencing, I'm

25   looking at this as a one count indictment, one count

10

Proceedings

1   conviction, however I have to record it on whatever sheet

2   that the Sentencing Commission makes me file as their

3   bookkeeper.

4            MS. SHIHATA:  So I'll be brief, your Honor, and

5   mostly state this for the record.  But first of all, we

6   agree that the guidelines are driven by the convictions

7   regarding the deprivation of civil rights and the

8   aggravated sexual abuse that predicates it.

9            THE COURT:  It's the same thing.

10           MS. SHIHATA:  Correct.

11           THE COURT:  It's the same thing.

12           MS. SHIHATA:  I understand, Judge.  I'm not

13  disagreeing with you.  Where I do disagree is that it is

14  mutually exclusive that the assault, the sexual abuse in

15  this case could not be both through physical force, and

16  you're right, we lay out and we believe we do assert that

17  physical force was used for all of them.

18           THE COURT:  That's her testimony.  Her

19  testimony was -- the reason that I agreed to do it was it

20  was because I was afraid, he threatened to do something

21  to me if I didn't agree to, if I didn't acquiesce.

22           MS. SHIHATA:  I understand, Judge.

23           THE COURT:  And in fact I put down here -- but

24  go ahead, I don't want to delay you.

25           MS. SHIHATA:  Judge, I fully understand that

11

Proceedings

1   you disagree with me.  That's of course fine, your

2   prerogative.  But my point is simply that the case law

3   does not require just an explicit threat in order for the

4   sexual abuse counts to be well founded.

5           THE COURT:  They may not.  I'm not saying that

6   it does.  I'm talking about what you charged him with and

7   what you proved and what her testimony was.  The fact

8   that he has the ability to cause her harm, that to me is

9   almost the same thing as a ward, in the capacity of a

10  ward, in his capacity as a ward, he had the power to do

11  as (indiscernible).

12          I mean basically what you've done here is

13  totally confuse this case with the way you've charged.

14          MS. SHIHATA:  Judge, I understand that's your

15  perspective.  Respectively, the government disagrees.

16  Respectfully, Judge, there was evidence in the record

17  from which the jury could find the sexual abuse count.  I

18  understand if your Honor disagrees.

19          THE COURT:  Let me ask you this.  Maybe I

20  missed it.  Could you show me where she said that the

21  reason that I acquiesced, or she didn't acquiesce so she

22  wouldn't have even said that, but the reason that I had

23  sexual relations with him was because he threatened --

24          MS. SHIHATA:  That's not the legal requirement,

25  Judge.  It does not need to be that he said the words if

12

Proceedings

1  you don't have sex with me I will put you in the SHU.

2  That is not what the case law requires and I'm not

3  suggesting that the evidence showed that explicitly.

4          THE COURT:  No your case law that you cited to

5  me was the threat or the fear, it doesn't have to be.

6  Obviously, you know, in the way the statutes are written

7  if it's too much of a physical threat, it doesn't even

8  violate the statute that you've charged.  But the statute

9  still requires that it caused the act to take place.

10         MS. SHIHATA:  And an act can be caused to take

11 place by multiple things.  Was there physical force?  We

12 believe there was.  But there was also --

13         THE COURT:  There was, of course.  I don't want

14 to say of course.  The jury found, I accept the jury's

15 verdict.  There are aspects of her testimony and the

16 evidence in this case that are problematic.  But in terms

17 of the jury's verdict, I'm not arguing with it.

18         MS. SHIHATA:  I understand, Judge, and I won't

19 belabor the point.  I understand what you're saying.

20         THE COURT:  Good.  Mark, did I give you

21 something?  There's actually an amendment to the statute

22 that's not directly relevant that was March 22nd.  But I

23 believe one provision that was added that sort of helps,

24 it says "Engages in a sexual act that causes another

25 person to engage in a sexual act."  And now I'm skipping

13

Proceedings

1    the language we've argued about.   "Without that other

2    person's consent to include doing so through coercion."

3    So it's the causing to do the particular act through

4    threats, fear or coercion.

5           But in any event, I found this accidentally

6    just by Shepardizing some of the cases that you cited in

7    your brief.  And the Second Circuit case that you cite in

8    your brief is actually a case where I think the officer

9    testified that that was the reason why she consented.

10   I'm talking about the one in the Federal Appendix that

11   you cited in your brief.

12          MS. SHIHATA:  That was a guilty plea, your

13   Honor, yes.

14          THE COURT:  I'm sorry, guilty plea.  Even

15   better.

16          MS. SHIHATA:  I have nothing to add on this

17   point, your Honor.  I will rest on our papers and --

18          THE COURT:  Okay.  So let's deal with what's a

19   reasonable sentence here.

20          MS. SHIHATA:  Are you starting with me?

21          THE COURT:  Whoever wants to talk about it.

22          MS. SHIHATA:  Go ahead.

23          MR. RICCO:  Oh, thanks.  Judge, it's always

24   difficult to pick a place to start it sentencing.  I

25   would share with the Court that as the Court can see from

Proceedings

1  our submissions, sentencing submissions, document 129 and

2  130, we struggled with the issues that your Honor just

3  discussed as to how do the verdicts in this case

4  translate into a reasonable sentence given all of the

5  factors the 3553(a).

6          And so we laid those arguments out.  I think

7  your Honor's had that.  It's interesting, Judge, that the

8  jury in this case rejected the theory of force of the 15

9  counts that went to the jury.

10          THE COURT:  Well, they rejected her testimony.

11  They essentially, on the counts that they acquitted,

12  which were forcible counts --

13          MR. RICCO:  And your Honor --

14          THE COURT:  -- went through the deprivation of

15  rights and the aggravated sexual abuse, they found that

16  she was not telling the truth.  There's no other way to

17  explain that acquittal.

18          MR. RICCO:  So your Honor, we looked at it from

19  the standpoint of mitigation in sentencing and how does

20  this verdict, how the underlying factors as spoken by the

21  jury apply here at sentencing.  So it took a long time,

22  Judge.  It took a long time, a lot of thought, a lot of

23  work.  And I think we've laid that out.

24          So this is what I'd like to say, Judge.  It's

25  very rare that we're here for sentencing with a defendant

15

Proceedings

1  that we've spent so much time with.  I mean length of

2  time.  So Judge, when we started this case, Carlos

3  Santiago was just married, he had no kids.

4           THE COURT:  With a wife that he was --

5           MR. RICCO:  With a wife.

6           THE COURT:  With a wife to whom he was married.

7           MR. RICCO:  Married.  That's correct.  That's

8  Carlos Santiago.  Okay?  So here we are for sentencing.

9  He's still married but he's got three kids now.

10          THE COURT:  And a grandchild.

11          MR. RICCO:  Well, not yet.

12          THE COURT:  Not yet?  I thought there was a

13 grandchild too.

14          MR. RICCO:  No, that's -- I'm talking about my

15 co-counsel, Santiago.

16          THE COURT:  Oh, okay.

17          MR. RICCO:  And I mentioned that because of the

18 breadth of the time period that we've had on this case.

19 And I know that oftentimes people view defense

20 perspective is just adversarial.  They're just saying

21 that because they're the defendant and that's what

22 they're supposed to say.  They could think that but the

23 reality is far from that.  We've had a lot of time to

24 spend with Carlos Martinez.  He has been in Essex County

25 Jail 59 months and a few weeks.  Five years.  He's been

16

Proceedings

1   there under very harsh conditions.  He was charged with a

2   sexual offense which makes serving time difficult in and

3   of itself, compounded by the fact that he's a law

4   enforcement officer made his housing situation very

5   difficult.  And then I won't even get into COVID.  But a

6   great deal of time was spent relating to Carlos Martinez

7   about what happened to him.  How did this happen to you?

8   What's going on with your life?  Because everything that

9   we've known about Carlos Martinez is that he signed up

10  for the Marine Corps coming out of the Red Hook projects

11  one week after his 18th birthday and he went into the

12  Marine Corps and served our country with distinction in

13  three combat circumstances.  He's decorated and came out

14  of the service with post stress disorder syndrome.

15          THE COURT:  Well there were three theaters of

16  violent war that he was involved with.

17          MR. RICCO:  Yes.

18          THE COURT:  At least if I recall from your

19  submission.

20          MS. SHIHATA:  Yes, Judge.

21          THE COURT:  He was in Libya and Kuwait and what

22  was the third?

23          MR. RICCO:  He's got Sharp Edge, which was in

24  Africa.  Just Cause, which is in Panama.  And then he's

25  in Desert Storm, which is the Gulf War.

Proceedings

1          And he, as a teenager, he's distinguishing

2   himself from the Red Hook Projects in a way that brought

3   great pride to his grandparents that raised him for the

4   most part, and his grandfather was in the military also.

5          And then he comes out of the military and goes

6   into the Bureau of Prisons.  And Judge, the government --

7   listen, nobody is disregarding his conduct.  But he goes

8   into the Bureau of Prisons and he is respected at the

9   highest level at the Bureau of Prisons.  He's a superstar

10  there not because he wanted to be a superstar, but

11  because of his conduct and action.  And so the officers

12  that testified all said Carlos Martinez was held in the

13  highest esteem at the jail.  That testimony is there from

14  the three officers.  I mean it's in our submission.

15         But also, Judge, Ms. Otis Delacruz testified

16  and she corroborated what the officer said.  And who is

17  Ms. Otis Delacruz?  She was a lady who was in that unit

18  with Maria on the 16th of April in particular.  She had

19  been not called as a government witness and we know why

20  because she didn't support the theory.  She testified

21  here that he always treated her with respect and dignity

22  as he did the other inmates.  Now that's not to disregard

23  his criminal conduct, but it's to tell us that something

24  happened to him along the way.

25         And Judge, this is what you also don't know.

18

Proceedings

1  Ms. Otis Delacruz, your Honor, we brought her here under
2  subpoena.  We caught hell for that from one of her
3  daughters.  She was a very sickly lady and her daughter
4  gave us hell for bringing her mother down.  And so you
5  call the witness, you look at their sheet, you try to
6  figure out what's going on.  And Judge, you know what we
7  discovered after the fact?  That Ms. Delacruz shouldn't
8  have been in jail all that time period in the first
9  place.  And so one of the things that I did was I had one
10  of my classmates in Boston look into her situation and he
11  filed an application for compassionate release for her.
12  And she's released.  She's with her family.  She was
13  deported.  She's back in the Dominican Republic.  She was
14  a courier who was represented by the lawyers who
15  represented the people that she worked for.  They picked
16  her lawyer and she got the time, and they went on about
17  their business which were people dealing drugs.
18          But Ms. Delacruz was like telling the truth
19  about the officers she worked with and she was telling
20  the truth about the lady that she served time with who
21  testified here under the name of Maria.
22          So this guy who's respected by so many, and
23  while he was at the Bureau of Prisons, one day he's
24  coming to work and engaged in an act, which he received a
25  commendation for valor, a truck was ablaze dangling off

Proceedings

1   the BQE right up the street from the jail and Carlos

2   Martinez runs, climbs up, carries the guy out of the

3   truck.  I guess he saved his life.  We don't know.  The

4   guy didn't die.  But he certainly removed him from peril.

5          And so what we know is the man before the Court

6   for sentencing is a man who throughout his life did

7   things to make people proud of him.  His interaction with

8   Maria is not one of those things.  His criminal conduct,

9   his criminal conduct that he was convicted of, and that

10  criminal conduct resulted in the loss of everything that

11  he worked for in his entire life.  He was fired from his

12  job, divorced from his wife.  She waited until after the

13  verdict.  He's penniless.  He lost his pension.  It's all

14  gone.  Couldn't pay anybody for anything.  He's got a $20

15  million lawsuit pending against him brought by the person

16  named Maria.  And good luck on collecting.  But the

17  character of the defendant that's established at a time

18  when they're not trying to curry favor but they're just

19  doing what they think is best, you know, people don't

20  want to hear that as sentencing.  We --

21          THE COURT:  You also left out his work at the

22  World Trade Center.

23          MR. RICCO:  I did, Judge.  In addition to, he

24  was a first responder at the World Trade Center and he

25  was rewarded for that with cancer.

Proceedings

1          THE COURT:  How long was he working there?  It

2    was more than just a day.

3          MR. RICCO:  He was there many weeks.  He was

4    there three or four months, Judge.

5          And so he's got a lot of character.  You know,

6    Judge, Carlos Martinez didn't testify in the first trial.

7    Maybe I didn't explain that to you.  But he didn't

8    testify because he had a serious conversation with his

9    counsel about his oath, what the oath means, what he's

10   done with his life, and how he needs to go about trying

11   to redeem himself and get his life back on track.  He

12   decided not to testify.  And I think we made a record

13   about it.

14         Judge, there's a serious Brady violation and

15   that serious Brady violation caused all of that work that

16   was done in the first case to be vacated.  As we said in

17   our papers, we would have never known about it because

18   the government effectively kept that information from us

19   through motions in limine and protective orders and the

20   other cases where Jane Doe number four testified.  We

21   would have never known about it, Judge, but for the fact

22   that the defense lawyer from that case was in the

23   courtroom previewing the testimony of the very same

24   witnesses that would be testifying in his case.  And when

25   that testimony came in, he said that wasn't what happened

21

Proceedings

1    in the trial.

2          And so we made a Brady demand.  And on the

3    Brady demand we discovered that the government had in

4    fact interviewed Jane Doe number four about the April

5    16th incident.  In that interview, that individual who

6    testified as the name Yolanda is what she testified to,

7    provided information that was contrary to the many

8    theories of prosecution in this case.  And because of it,

9    the Court granted the motion because it brought into

10   question the whole concept of how force was done and what

11   were the honest reportings of it before people got

12   lawyered up and began thinking about the millions of

13   dollars that they're going to get one day.

14         And so we had a second trial.  And in the

15   second trial, Judge, Yolanda got on the witness stand and

16   Judge, she denied every statement that was the basis of

17   the reasons why it was vacated.  So at page 540, lines 2

18   to 4, she denied that Otis Delacruz asked her if she

19   would accompany her or go with her down to clean and the

20   woman said no.  She said I never said that.  She denied

21   that a few days after this event Yolanda asked Maria why

22   she did not want Otis Delacruz or her to go along with

23   her to clean.  She denied that that conversation ever

24   happened.  She denied that at page 540 lines 11 through

25   17.  She denied that she told the agent and the

22

Proceedings

1    prosecutors present in this courtroom that Maria told

2    Yolanda that she wanted to go along because she was

3    leaving and she was having relations with the man.

4              THE COURT:  In the testimony that my law clerk

5    typed up for me, which I asked her to do so I would have

6    it handy, there is one question that I think Mr. Santiago

7    said --

8              MR. RICCO:  Mr. Martinez, your Honor.

9              THE COURT:  You know, you're getting me

10   confused with Santiago and Martinez.

11             MR. RICCO:  I know.

12             THE COURT:  This is Mr. Santiago who's

13   questioning.

14             MR. RICCO:  Who's questioning, yes, Judge.

15             THE COURT:  Okay.  And this is Yolanda I

16   believe.

17             MR. RICCO:  Yes.

18             THE COURT:  "You also told them that you asked

19   Maria if you could go up there and clean with her and

20   Maria said no.  Correct?"  Yolanda, "Yes.  I asked her if

21   I could go and she said no," which is one of the many

22   things that troubles me about the evidence in this case

23   and the quality of the evidence in this case.

24             MR. RICCO:  Yes, it --

25             THE COURT:  Of course the jury acquitted on

23

Proceedings

1  that particular count.

2          MR. RICCO:  They did.  And Judge --

3          THE COURT:  And it still raises in the overall

4  picture why she even went down there.  She was about to

5  be released.  This was within a couple of days, a couple

6  of weeks, I don't remember her projected release date.

7  And --

8          MR. RICCO:  Well, Judge, what --

9          THE COURT:  -- being a question from her own

10  testimony (indiscernible) physically he came -- he just

11  had come back to work from what looked like some complex

12  hernia surgery, how competent he was to engage in violent

13  physical activity.  So even though she did go back on

14  what she told the FBI agent, and what she told the FBI

15  agent is in evidence, that's part of what's stipulated

16  that if the agent testified that's what she would say.

17          MR. RICCO:  Yes.

18          THE COURT:  But she did say that Yolanda said

19  that she said to Maria do you want me to come with you,

20  and I find that -- that's one of the many aspects of

21  Maria's testimony that I find troubling.

22          MR. RICCO:  And Judge, to me what makes it

23  difficult for sentencing purposes is that I don't get it,

24  I missed something here, the very statements that

25  provided the basis of us having a retrial in the first

24

Proceedings

1    place, the witness takes the stand and denies that she

2    ever made them.

3              THE COURT:  But she admits she made a

4    significant one.  The question was that she went back on

5    why did she, and I'm only paraphrasing, is essentially

6    why didn't she want you to go she may have said something

7    it's because I have a relationship with him.  That's the

8    part that I think she went back on.

9              MR. RICCO:  Yes.  But Judge, she does --

10             THE COURT:  But that was in front of the jury

11   as well because the agent's summary of notes was there.

12             MR. RICCO:  Well, yeah.  And Judge, to me that

13   is the most important part of it because it really calls

14   into question when you look at the totality of the

15   evidence, you look at the other officers who testified

16   who said we never saw any stress.  She was always

17   escorted down.  The officers escorted her back and forth

18   and they never saw any distress.

19             THE COURT:  They're talking.  Don't know what

20   to make of that.  But let's say they said that.  It's

21   still a question of this going down, stop in February

22   after the strange Facebook --

23             MR. RICCO:  Facebook call.

24             THE COURT:  -- call in which she was obviously

25   trying to find out personal information about the

25

Proceedings

1  defendant which would have corroborated her interest in a

2  relationship with him.  And then when he found out about

3  it and she found out about it, it stopped.  He stopped

4  calling her.  And then there was this last one and she

5  could have presumably have avoided it.  And you know,

6  we're dealing here with, I mean you know you're dealing

7  with people who are in jail who are not people of the

8  highest moral character and who all have problems.

9        But this last April 16th, April visit whenever

10  it was --

11        MR. RICCO:  April 16th.

12        THE COURT:  April 16th.  It's one of the --

13  that and the Facebook call are one of the things that I

14  have terrible qualms about.  But she was acquitted.

15        MR. RICCO:  Yes, Judge.  So I really -- I mean

16  we wrote so much about sentencing that I know that the

17  Court has a firm grasp on the points that we want to

18  make.

19        THE COURT:  Don't assume anything.

20        MR. RICCO:  I generally don't, Judge.  But I

21  will say this.  What the Court doesn't know about is the

22  many hours that were spent with Carlos Martinez, his very

23  depression that we saw after the second verdict.  He

24  looked horrible, lost.  You know, he's doing much better.

25  He's hopeful for his future.  He knows he has a lot of

26

Proceedings

1  building to do.  He has to rebuild his life, rebuild his

2  relationship with his daughter who, by the way, is going

3  to college now, his youngest daughter started in college.

4          And Judge, his aunt is present here today.

5  She's seated in the first row.  And there was a time when

6  we tried this case the courtroom was packed.  All the

7  correction officers were here and different people.  And

8  the one lady stayed throughout, she's been to every

9  proceeding, and Carlos, as you recall, Judge, Carlos

10  Martinez's mother died while he was detained in this

11  case.  We had made an application to try to get him there

12  and weren't able to.  And his mother's sister has

13  remained very supportive of her nephew.  She's heard the

14  testimony.  She believes in him.  She has strong

15  religious beliefs, and the defendant does too.  And he's

16  never lost that.  I could go on but I'm not.

17          THE COURT:  Well notwithstanding the fact that

18  I am concerned about whether false testimony was given by

19  the complainant and the jury found that, I still have the

20  guilty verdict which I can't set aside.

21          MR. RICCO:  That's true.

22          THE COURT:  And it's a forcible rape by a

23  prison guard and --

24          MR. RICCO:  So Judge, I have to --

25          THE COURT:  I could say, and this is not a

Transcriptions Plus II, Inc.

27

Proceedings

1  defense to him, but one of the things that's been

2  bothering me about this is I believe, and again I want to

3  repeat, that this is not a defense at all to him, that

4  the MDC has been at an enabler of these rapes.  I had one

5  case involving Clark Mullins who you didn't charge.  When

6  I say you, Ms. Geddes, I don't mean you personally, but

7  the U.S. Attorney's Office didn't charge him with

8  forcible rape.  And when I read the testimony, I mean I

9  believe it was a guilty plea, but when I read it, I

10 upwardly departed I think it was to eight and a half

11 years because it seemed to me I couldn't understand why

12 this wasn't charged as a violent rape.

13         Judge Ross's case involved five separate -- and

14 I know you divide it up and you want to make it look a

15 little less terrible in terms of comparing sentences, but

16 it involved one officer and five I believe women who were

17 subject to one form or another of sexual assaults.  We'll

18 just use the word loosely.  Two of them may have been

19 violent rapes.  And now I have this case.  So that's

20 seven.  And when I say the MDC was an enabler, it wasn't

21 that there were that many incidents, but they send women

22 to clean the office of male officers.  The officers are

23 not under close circuit surveillance.  But the setup is,

24 as you went through all the pictures, was that the

25 officer inside the office can see what was going on

28

Proceedings

1   outside and see if anybody was coming.

2          And the final step in this enabling processes

3   is when a complaint is made, whether the testimony was

4   not entirely clear whether it was temporary or more than

5   that, the complainant is put in the SHU which is solitary

6   confinement 23 hours a day.  And that's how this system

7   works or has worked.  And I don't know what's going on.

8   I mean there was some indication in a note that Mr. Ricco

9   sent me last night that there's some separate Department

10  of Justice investigation that's going on.  This is just

11  inexcusable.  They are enablers of what's going on.

12          And then I have the warden who has the nerve to

13  write me a sentencing letter in this case when I suspect

14  that the warden who was there when these things were

15  going on was probably permitted to retire without

16  consequence.  And it's just shocking, shocking degree to

17  which the Bureau of Prisons at the MDC enabled this to

18  happen.  No one had the foresight to think we shouldn't

19  send women, and in effect it's almost a degree of sexism

20  which is the least of the crimes to send a woman in to

21  clean as opposed to men.  So I just --

22          MR. RICCO:  Judge, what I wanted to add, and it

23  is --

24          THE COURT:  And I want to make it clear this is

25  not a defense to any guard who committed a rape.  It's

29

Proceedings

1  not a defense.  But these crimes were enabled by the

2  people who ran the Bureau of Prisons.  And that's one of

3  the things that's really bothered me through these cases

4  that I've had.

5          Go ahead.  I'm sorry if I interrupted you.

6          MR. RICCO:  Yes.  So Judge, along those lines,

7  and these arguments that I'm making are really in

8  mitigation of sentencing, not of guilt.

9          THE COURT:  No, no, no.  I know.

10         MR. RICCO:  And I would say this, Judge, the

11  case that --

12         THE COURT:  Well I wanted to get to that.

13  That's what I wanted to get to.  I wanted to get to the

14  issue of sentencing because these are serious crimes in

15  an institution like that, assuming it was committed, and

16  I have to accept the jury's verdict despite my own qualms

17  about her credibility.  It's ultimately a credibility

18  determination.  I couldn't set aside the verdict even if

19  you had timely moved on that count.

20         MR. RICCO:  Judge, the case that

21  (indiscernible) --

22         THE CLERK:  The microphone.

23         MR. RICCO:  Sorry.  The case that you upwardly

24  departed about that you mentioned, I'm familiar with

25  that.

Proceedings

1          THE COURT:  That was Clark Mullins.

2          MR. RICCO:  Yes, Judge.  And I'm familiar with

3    that case and your Honor's ruling with respect to that

4    case.

5          THE COURT:  You were the original lawyer and

6    then he was stupid enough to get somebody else.

7          MR. RICCO:  Well, I agree with that.  But I do

8    know, Judge, that having read your concerns, I get it.  I

9    mean it was.  I mean it was a prosecutorial decision was

10   made to allow a person to plead to a count just involving

11   a ward thing.  But --

12         THE COURT:  Maybe the government had their own

13   qualms about the credibility of the witness.  I don't

14   know.

15         MR. RICCO:  They may have.  I don't know,

16   Judge.

17         THE COURT:  Occasionally I think about it

18   particularly since I've immersed myself in this

19   particular case.

20         MR. RICCO:  And then Judge, the other case was

21   a case that involved many of these same, several of these

22   same witnesses involving the case in front of Judge

23   Matsumoto.  And that defendant's conduct dated back to

24   2013.  And tried by the same prosecutorial team.  His

25   guidelines were life also.  He was convicted of forcible

Proceedings

1    rape, multi-counts of it.  There were no acquittals in

2    that case.

3              THE COURT:  I know but --

4              MR. RICCO:  I'm just saying this, Judge.  The

5    sentence that was imposed --

6              THE COURT:  Ms. Geddes has broken it down so

7    that you can't say they're Rule 5 forcible rapes.

8              MR. RICCO:  Well there were no -- there was

9    some differences but he was convicted --

10             THE COURT:  Yes, I know.  But there were five

11   separate instances of improper, we'll just use that word,

12   neutral word, sexual contact.

13             MR. RICCO:  And even one --

14             THE COURT:  Including one at least, I don't

15   remember --

16             MR. RICCO:  Right.  And then there was one

17   count --

18             THE COURT:  -- whether it was one or two of

19   forcible rape.

20             MR. RICCO:  There was one count standing alone

21   of an attempted.  But the fact of the matter, Judge, is

22   that the kind of time that the government is requesting

23   in here is just disproportionate and disparate given

24   sentences that are imposed for the same kind of facility

25   by people who have engaged in far more egregious conduct

Proceedings

1   with far more women.  I'm sure that their investigation

2   is what it is involving this woman who testified here.

3          We had asked that the Court consider a sentence

4   of 60 months.  And why?  Five years in prison is a long

5   time.  It's not a light sentence.  I represented a

6   defendant here who was charged with having sex with a

7   ward and one count and she received a sentence of a year

8   and a day.  Different circumstance obviously as each

9   individual case is different.  And I'm a great believer

10  that defendants are entitled to an individual assessment

11  of who they are in their case.

12         I mention it because of fairness in sentencing.

13  We don't lose fairness at the time of sentence.  It's

14  probably the time where fairness needs to be at its

15  highest level because of the loss of liberty and

16  everything that goes along with it.

17         The last five years for Carlos Martinez have

18  been very harsh.  He's been through COVID.  And many

19  judges of this court, your Honor included, have granted

20  relief to defendants at sentencing because of it.  Carlos

21  Martinez endured that also in addition to the

22  circumstances of his detainment resulting from the type

23  of charge and the fact that he's a law enforcement

24  officer.

25         It's probably been the most difficult time -- I

33

Proceedings

1  know that it's been the most difficult time at least in

2  my career that defendants have had to endure being

3  incarcerated.  And it's a factor that I would ask the

4  Court to consider.

5          I'm familiar with your Honor's sentence, Mr.

6  Mullins.  And I guess I arrived at the suggestion based

7  upon the involvement of COVID and the two years that Mr.

8  Martinez endured as a result of that was not present.  I

9  don't know if your Honor would have considered that as an

10  issue in the Mullins case or not or to what extent, or to

11  what extent it should be considered here.  But it is a

12  factor.  It is a real-time factor that affected the

13  defendant.  It was a part of his punishment.

14          But I can tell the Court that my belief is that

15  the defendant before the Court, if the word atone means

16  anything, that he's gone through that process that

17  everyone would expect all of the defendants to do, and

18  that has happened for him.  That I'm confident of because

19  we've had to endure such a long time with this case.  Not

20  because of the government or anything.  Two years of it

21  has been COVID.  But if there's a such thing as

22  unintended consequences, the unintended consequences of

23  that is that it provided a time period for reflection,

24  isolation, and for Mr. Martinez to regroup.

25          And I don't have anything else to add, Judge.

34

Proceedings

1   I don't.  It's all been said.  It's all in the papers.

2           THE COURT:  One of the things that I said when

3   I departed upwardly in Clark Mullins in terms of the

4   factors that go into the sentencing guidelines, it's not

5   a question of deterring him in terms of deterrence being

6   one of those factors.  I don't think anybody thinks that

7   he's going to go out and become a serial rapist.  This

8   happened because of a particular circumstance that lent

9   itself to it.

10          But what message do I send?  And I said this to

11  guards at the MDC, I've already tried to send a message

12  to the MDC to the extent they never pay any attention to

13  what judges think.  What message do I send to people who

14  are at the MDC.  I mean that to me is I think --

15          MR. RICCO:  Judge, I think --

16          THE COURT:  -- this is a serious crime in terms

17  of the 3553(a) factors.  I don't think there's any --

18  there's no doubt in my mind that he is not going to go

19  out and rape anyone if he's released.  He's not a violent

20  criminal.  He's led an otherwise admirable life in terms

21  of the factors that we went through near the outset of

22  your presentation.  But you know, to what extent do I

23  impose a sentence that would be imposed if it was simply

24  purely consensual and it was simply a ward situation.  I

25  mean that's the thing that I'm somewhat torn by, that and

35

Proceedings

1  the fact that I'm concerned about her veracity as a

2  witness.

3           MR. RICCO:  Judge, I still take the position

4  that five years in prison is a powerful --

5           THE COURT:  I don't quarrel with that.  There

6  are times when I have conversations with my law clerks,

7  maybe not with this group because of COVID we haven't

8  spent as much time with each other.  But I'd say a year

9  doesn't sound like a lot unless you have to serve it.

10 And five years is an awful lot.  I'm aware of that.  But

11 you know, there are other considerations I have to take

12 into account.

13          All right.  Shall we hear from the government

14 and then your client?  Or do you want me to hear from

15 your client and then the government?

16          MR. RICCO:  Let's hear from the government and

17 then Mr. Martinez can respond to what they have to say

18 about him.

19          THE COURT:  I need to take my mask off to take

20 a drink of water.

21          MS. SHIHATA:  Should I proceed or --

22          THE COURT:  I think I can drink water and

23 listen to you at the same time.

24          MS. SHIHATA:  I'm sure you can.  I'm sure you

25 can.  Thank you, your Honor.

36

Proceedings

1        I would just like to start by indicating that

2   the government does not agree that the only reasonable

3   conclusion that the Court can draw from the jury's

4   verdict is that they did not credit Maria's testimony.  I

5   think an equally reasonable conclusion and frankly one

6   that is supported by the jury's verdict is laid out on

7   page 5 of our October 28, 2021 letter.

8        And I want to take us back for a moment to the

9   evidence and the testimony in this case regarding the

10  first incident where the jury found the defendant guilty

11  of aggravated sexual abuse.

12        THE COURT:  I'm not questioning the verdict.

13        MS. SHIHATA:  I understand, but it informs the

14  rest of what I'm going to say.  So if the Court would

15  indulge me, I'd appreciate it.

16        With respect to the factual scenario of that

17  incident, the evidence was that the defendant had called

18  Maria down to clean the second floor area and that during

19  the course of the interaction in the lieutenant's office,

20  he pinned her down on the desk, pulled her pants down,

21  and forcibly raped her from behind with such an amount of

22  physical force that ultimately resulted in her bleeding.

23        Now I think that's important --

24        THE COURT:  She testified -- I don't want to

25  get into all of this stuff.

37

Proceedings

1          MS. SHIHATA:  She did testify to that, but

2   there was --

3          THE COURT:  She testified that the bleeding was

4   due to the fact that she had not had sexual intercourse

5   in some time.

6          MS. SHIHATA:  She may believe that --

7          THE COURT:  Now I know Ms. Geddes at some

8   point in the transcript --

9          MS. SHIHATA:  -- but I don't think

10  scientifically that that's how it works.

11         THE COURT:  -- said that that wasn't so but I

12  believe it's on page 79 that --

13         MS. SHIHATA:  I believe that was in the first

14  trial if I'm remembering.  I don't think --

15         THE COURT:  No, I think it was --

16         MS. SHIHATA:  Anyway --

17         THE COURT:  Unless I have the wrong transcript.

18         MS. SHIHATA:  -- be that as it may, the jury

19  could certainly infer and conclude, as it did I

20  believe --

21         THE COURT:  They found it.  I didn't say they

22  didn't --

23         MS. SHIHATA:  Okay.  But the reason it's

24  important, Judge --

25         THE COURT:  -- credit her testimony on that

Proceedings

38

1  count.  They did.

2          MS. SHIHATA:  Understood.  But the reason it's

3  important, Judge, is because the fear element can also be

4  a fear of the use of that amount of physical force.  So

5  for example, if she is fearful that he is going to use

6  that amount to get her to submit, that's a fear under the

7  law that even though he used some lesser amount of

8  physical force, and that qualifies and is consistent with

9  the jury's verdict.  Your Honor may disagree with me.  It

10  appears that you do.  But I want to make the record clear

11  that there is a conclusion that can be drawn from the

12  evidence that entirely credits Maria's testimony.  And

13  that actually fits the verdict that was rendered by the

14  jury in this case.

15          THE COURT:  Well that's not what the jury was

16  charged and that's not the way --

17          MS. SHIHATA:  Your Honor, they were charged.

18  They were --

19          THE COURT:  It's not the way you charged it and

20  it's not --

21          MS. SHIHATA:  I disagree, but I'll move on.

22          THE COURT:  It's not clear to me that your

23  construction of the statute is correct.  She did not say

24  this.  You're putting those words in her mouth.

25          MS. SHIHATA:  A jury is permitted to draw

Proceedings

1    inferences from the evidence though, Judge.

2            THE COURT:  Could you tell me that she said

3    what you just said?

4            MS. SHIHATA:  Sorry, I didn't hear you.  I

5    apologize.

6            THE COURT:  That she gave the reason for

7    acquiescing because she was afraid that the next time he

8    was going to use force.

9            MS. SHIHATA:  Judge, it is not --

10           THE COURT:  Could you answer that?

11           MS. SHIHATA:  I don't believe she --

12           THE COURT:  That only requires a yes or no.

13           MS. SHIHATA:  No, she did not explicitly say

14   that.

15           THE COURT:  She did not say that, no.

16           MS. SHIHATA:  But it is also clearly the law,

17   Judge, that a jury can draw inferences from the evidence

18   and that is a valid inference to draw.  You may not have

19   agreed and you may not have drawn that inference but the

20   jury certainly could.

21           THE COURT:  I might have.  The question is --

22   I'm not saying I agree or disagree.  I just think that

23   the question is what caused her to consent to the extent

24   there was consent if she consented as opposed to each

25   time he approached her.

Proceedings

1          MS. SHIHATA:  There's a difference --

2          THE COURT:  As you described it in your letter,

3    there was no conversation.  He just violently assaulted

4    her each time.

5          MS. SHIHATA:  Your Honor, knowing the

6    consequences --

7          THE COURT:  And in each case you describe it in

8    your opening statement as rape.

9          MS. SHIHATA:  Rape is not just physical force,

10   your Honor.

11         THE COURT:  Now it's one thing if she said that

12   the reason that I -- she didn't say she acquiesced, but

13   the reason I went along, the reason I didn't fight was

14   because I was afraid.  The fact is that she actually did

15   fight on one occasion.

16         MS. SHIHATA:  She did.  And he then threatened

17   her with five years in prison.  He said do you know what

18   you could get for that?  Which is entirely consistent

19   with the government's theory, Judge.

20         THE COURT:  What you could get for assaulting a

21   federal officer, a prison guard or a prison officer.

22         MS. SHIHATA:  Yes, but it has to be looked at

23   in the context of what was going on, Judge.  And by the

24   way, she did testify that she was scared.  And there is

25   case law I believe from the Fifth or the Eighth

41

                              Proceedings

1  Circuit --

2           THE COURT:  I know she was scared.  Why did she

3  go down there on the last time?

4           MS. SHIHATA:  Because he was -- she is an

5  inmate, she doesn't get to decide that she's not going to

6  go down when a lieutenant, who's the highest ranking

7  person in jail at the time says --

8           THE COURT:  She was asked by another prisoner

9  whether she wanted to be accompanied.  And it was also

10 quite near the end --

11          MS. SHIHATA:  Your Honor, Otis Delacruz did

12 testify at the trial --

13          THE COURT:  It was also --

14          MS. SHIHATA:  -- and did not recall that.

15          THE COURT:  It was also right near the end of

16 her prison sentence.  Days away.

17          MS. SHIHATA:  Exactly, Judge.  And she wanted

18 to get out of the MDC which was a horrible place for her

19 where these things occurred.  Judge, I'm not trying to

20 convince you at this point but I think the record is --

21          THE COURT:  The record is that the jury found

22 what they found and they found him not guilty.

23          MS. SHIHATA:  And they found him guilty of

24 sexual abuse using fear.

25          THE COURT:  And they did, they found him --

42

Proceedings

1          MS. SHIHATA:  Of not just aggravated sexual

2    abuse.

3          THE COURT:  I don't --

4          MS. SHIHATA:  You may disagree with them but

5    that is in fact what the verdict was.  And that's all I'm

6    saying is that there is evidence from which the jury

7    could reach that verdict.  I understand that you

8    disagree.  I am simply making a record that there was in

9    fact evidence about it.

10         THE COURT:  Okay.  There was.  Let's assume

11   you're right --

12         MS. SHIHATA:  But now I will move on.

13         THE COURT:  I'm not sure what that adds to the

14   discussion we're having.

15         MS. SHIHATA:  Okay.  I think what it adds,

16   Judge --

17         THE COURT:  Because the worst part of what he

18   did was physically assaulted her each time as you

19   describe it in your letter and as you characterized it in

20   your opening statement.

21         MS. SHIHATA:  I agree, Judge, that is the worst

22   part and that is the most serious.

23         THE COURT:  I don't think that there was any

24   adequate response in the summation to the call, I keep

25   calling it a call, to the Facebook investigation.

43

Proceedings

1          MS. SHIHATA:  There was testimony.  And I'm not

2     trying to retry this case, Judge, at the sentencing but

3     there was testimony --

4          THE COURT:  No, some of the stuff is relevant.

5          MS. SHIHATA:  Understood.  And I would like to

6     remind your Honor, and I'm sure it sounds like you read

7     the transcript and are fully familiar with the records

8     are not trying to suggest otherwise, but there was

9     testimony about the reasons that she made that call in an

10    effort to make the abuse stop.  And she thought that he

11    would be listening to it and that this would help.

12         THE COURT:  Then she knew that if she -- you

13    know, you're going around in a somewhat conflicting

14    argument.

15         MS. SHIHATA:  Judge, the one thing --

16         THE COURT:  She was afraid to make a complaint

17    but in effect she was doing something that would in

18    effect be the equivalent in terms of her tormentor

19    finding out what she was doing.

20         MS. SHIHATA:  She believed he was listening to

21    her calls.  The point was not so that --

22         THE COURT:  And why was the request made about

23    whether he was married or not and why were questions

24    asked about the women who were in the pictures?

25         MS. SHIHATA:  Because she wanted him to be

44

Proceedings

1   concerned that she had made this call and concerned

2   enough that he would stop.  Your Honor, the one thing

3   that's clear from the evidence is that --

4           THE COURT:  Well, the call could have

5   indicated --

6           MS. SHIHATA:  -- she did not know --

7           THE COURT:  The call could have indicated to

8   this person, we'll call it a call, whatever, I don't know

9   from Facebook,  but it could have, if that was her

10  concern, she could have said I'm being sexually assaulted

11  by a lieutenant.

12          MS. SHIHATA:  Your Honor, she believed because

13  of what he told her --

14          THE COURT:  That would put a stop to it.  In

15  fact, this call put a stop to it.

16          MS. SHIHATA:  She believed that because of what

17  he told her that if she reported that explicitly she

18  would go to the SHU as punishment.  Okay?  Now were there

19  better ways for her to report this?  Absolutely.

20          THE COURT:  Well she didn't go to the SHU and

21  it had the exact same effect.

22          MS. SHIHATA:  She didn't go to the SHU because

23  she didn't report it, Judge.  And it didn't have the

24  exact same effect.  He sexually abused her one more time.

25          THE COURT:  She knew that he would find out

45

Proceedings

1   about the call and he did.

2          MS. SHIHATA:  Yes, he found out about the call

3   because Tomas Rodriguez, the SIS officer, told him about

4   it which was not actually the protocol that he should

5   have followed.

6          THE COURT:  And it may be but you just told me

7   it would have the effect of putting, you know, she wanted

8   to put a stop to it.

9          MS. SHIHATA:  I told you that that's what she

10  believed.

11         THE COURT:  All right.  That's what she

12  believed.

13         MS. SHIHATA:  I think we should also

14  acknowledge, your Honor, she was in her twenties at the

15  time.  Would I have gone about things that way?  No, of

16  course not.  But she's in the situation she's in.

17         THE COURT:  Well, she had a --

18         MS. SHIHATA:  And she was doing the best she

19  could to try to make this stop.

20         Now the point, Judge, my only point in raising

21  these points is that inferences can be drawn in favor of

22  the jury's verdict and not against it and that the

23  evidence does not -- the only conclusion that one could

24  draw, which is what your Honor suggested, is that she was

25  not telling the truth.

46

Proceedings

1          THE COURT:  The jury was not charged in a way

2    that would support that verdict.  But it's neither here

3    nor there because in my view she never testified that the

4    reason that she made no effort to -- this is a case of

5    forcible rape under her testimony.  That's the bottom

6    line.  It wasn't a case where she said I was caused to do

7    this because I was in fear of threats or force and you

8    acknowledge that she never said that that was what

9    motivated her.  What motivated her throughout this was

10   that essentially forcing her.  And the jury didn't

11   believe that.

12          MS. SHIHATA:  Your Honor, I disagree.  I don't

13   acknowledge that.  What I acknowledge was that there can

14   be more than one causative element and that it was both

15   physical force and threats and fear.

16          THE COURT:  The one that you argued was the one

17   that was consistent with what I was saying.  And when I

18   say you, I'm separating you from Ms. Geddes who gave a

19   somewhat more subtle summation.  Maybe nuanced is a

20   better word.  I don't know.

21          MS. SHIHATA:  Anyway at this point, your Honor,

22   let me move on towards the --

23          THE COURT:  In fact, the person who wrote the

24   pre-sentence report said she was raped all the time.

25          MS. SHIHATA:  I would just like to note, Judge,

47

Proceedings

1   forcible rape does not require physical force.  A person

2   can be forced through the use of fear and threats as

3   well.

4            THE COURT:  Okay.

5            MS. SHIHATA:  And any rate, I will move on now

6   to the Section 3553(a) factors for the Court.

7            THE COURT:  But I hate to get involved with

8   these legal debates.  The deprivation of rights charge,

9   and I think I may have given what you asked for, said

10  they had to find him guilty of aggravated sexual abuse in

11  order to find him guilty of deprivation of rights.

12           MS. SHIHATA:  And in turn guilty --

13           THE COURT:  That was right in there.  That's

14  why you create problems by making up four separate

15  counts, four separate crimes for what is essentially one

16  for each discrete act.  But the specific charge on the

17  deprivation of rights was they had to find aggravated

18  sexual abuse and they didn't find it except on one count.

19           MS. SHIHATA:  I'm not disagreeing with your

20  Honor.

21           THE COURT:  Okay.

22           MS. SHIHATA:  Okay.  So moving on to the

23  section 3553(a) factors.

24           THE COURT:  And by the way, I got your

25  second -- you sent me a second victim impact statement.

48

Proceedings

1          MS. SHIHATA:  Yes, your Honor.  Thank you.

2          THE COURT:  I assume that Mr. Ricco got it.

3          MS. SHIHATA:  Yeah, it was filed on ECF, Judge.

4          MR. RICCO:  We did.

5          THE COURT:  And let me just say something about

6   that.  It sounded familiar to me.  And the reason it

7   sounded familiar to me was because of the discussion we

8   may have had at the end of what she told Immigration and

9   Naturalization in support of her claim for I guess it's a

10  T visa, that she had been sexually trafficked.  And you

11  can read the testimony yourself, it just sounded awfully

12  familiar to me in terms of statements that she was

13  making.  That's also neither here nor there.  And I don't

14  purport to be an expert on the effect that the horrible

15  claims that she made to the INS or to Immigration somehow

16  would have prevented her from the sufferings that she

17  described in the letter.  All I'm suggesting is that when

18  I read the letter I said why does this sound familiar?

19  And I went back and I read the argument about the

20  stipulation.  But go ahead.

21          MS. SHIHATA:  With respect to the Section

22  3553(a) factors, I think as the Court has recognized

23  these are serious crimes.  I would respect what the Court

24  said regarding the MDC being an enabler.  I think on that

25  you and I wholeheartedly agree.

49

Proceedings

 1          THE COURT:  Well you and the Bureau of Prisons,

 2   I think one of you may have even said this in the

 3   transcript somewhere, are part of the Department of

 4   Justice and the one good thing about this is unlike New

 5   York where there is no single agency that oversees the

 6   enforcement of the criminal laws where people can blame

 7   each other, is that the Department of Justice has

 8   oversight over you and the Bureau of Prisons.  You're not

 9   separate agencies.

10          And the Bureau of Prisons in my view, not only

11   here but in many other respects, operates in a manner

12   that leaves a lot to be desired.  In fact, somebody

13   should ask for the ombudsman of the Department of Justice

14   to look into how the MDC is being run here including the

15   sexist business of sending women to be cleaners as

16   opposed to man where women make actually a relatively

17   small percentage of the population of the MDC as I

18   understand it.

19          MS. SHIHATA:  Understood, Judge.  And like I

20   said, I don't disagree with the Court what you said about

21   the MDC.

22          THE COURT:  Well, you should try and do

23   something about it.

24          MS. SHIHATA:  I actually have, Judge.  I'm

25   happy to talk to you about that offline.

50

Proceedings

1           THE COURT:  Not you personally.  The U.S.

2    Attorney should do it.

3           MS. SHIHATA:  Understood.

4           THE COURT:  Another good thing about the

5    Department of Justice that people don't always realize is

6    that the U.S. Attorney is an appointee of the president

7    and therefore has a certain degree of independence

8    notwithstanding the fact that there is an attorney

9    general.  Only the president can fire a U.S. Attorney and

10   that gives the U.S. Attorney one significant advantage.

11   And the other significant advantage that it gives the

12   U.S. Attorney is that he stands on the same footing as

13   presidential appointees in the Department of Justice

14   including the head of the Bureau of Prisons.  And if

15   anything is going to come of it, it should be in a letter

16   from U.S. Attorney.  But we're going off on a tangent and

17   I don't want to go off on it any further.

18           MS. SHIHATA:  So moving back to the 3553(a)

19   factors, Judge, the additional point I wanted to make on

20   that issue is that the testimony and the evidence at the

21   trial certainly established that the defendant used the

22   tools that the MDC provided him with.  And he does have

23   agency in this scenario.  He decided to call Maria to

24   clean for him.  He did that is a high ranking official at

25   the jail.  He did that at times when he knew the second

51

Proceedings

1  floor would be empty.  He used the tools he had access to

2  including the security camera systems.

3          THE COURT:  Let me ask you something.  I don't

4  mean to interrupt but I am interrupting.  There was some

5  ambiguity in the record.  I don't know if it ever got

6  straightened out in terms of the jury knowing about it.

7  He testified, or there was testimony that she had a job,

8  she had what one would describe as a full-time job five

9  days a week working in the medical unit.  And this

10  weekend work, I don't know what the truth is, but there

11  was an ambiguity in the record as to whether this was

12  quote voluntary or she had to work on weekends in

13  addition to the full-time, what I would characterize as

14  the full-time job that she had Monday through Friday.

15          MS. SHIHATA:  She didn't work Monday through

16  Friday, Judge.  Her job was actually to work at those

17  times and --

18          THE COURT:  I'm sorry I don't know what you

19  mean those times.  I thought the testimony was that she

20  worked in the medical unit and that she worked in the

21  medical unit unless she was off, she worked in the

22  medical unit five days a week and she worked for him on

23  weekends.

24          MS. SHIHATA:  There was also testimony, Judge,

25  from both MDC legal counsel I believe, Nicole McFarland,

52

Proceedings

1  as well as from Otis Delacruz, the witness the defendant

2  called, that when Maria was called on the weekends that

3  she was required to go and that she couldn't just say no.

4  And in fact --

5          THE COURT:  And maybe you could send me that

6  testimony.  I don't remember it.  I know --

7          MS. SHIHATA:  I can cite it for you now, Judge.

8          THE COURT:  My recollection was that this came

9  up in terms of the jury note, certain pages were sent in

10  to the jury from the transcript as being responsive to

11  their note, and I thought that there was an ambiguity in

12  the pages of the transcript that were sent in to the

13  jury.  Now I could be wrong.  This is a long transcript

14  and I spent a lot of time reading it.

15          MS. SHIHATA:  Your Honor, I recall that we had

16  extensive argument about it.  I recall that.  And I --

17          THE COURT:  That was a part that dealt with --

18  it was a jury note.

19          MS. SHIHATA:  Yes, your Honor.  We had --

20          THE COURT:  And it dealt with how a jury note

21  would be answered.  And ultimately an agreement was

22  reached that here are the pages in the record that are

23  responsive to your note.

24          MS. SHIHATA:  Yes.

25          THE COURT:  And I looked at those pages and it

53

Proceedings

1   didn't seem to me that they provided a clear answer.

2          MS. SHIHATA:  Included in those pages, I

3   believe your Honor, was testimony from Otis Delacruz, who

4   was called by the defendant.  And she indicated quote,

5   "You don't do what you're supposed to do they will write

6   you up."  That's at page 671 of the transcript.

7          THE COURT:  I know, but if you don't do what

8   you're supposed to do they'll write you up, depends on

9   what you're supposed to do.

10          MS. SHIHATA:  And it was in the context, Judge,

11   of Maria going down, being told to go down to clean.

12          THE COURT:  What page in the transcript?

13          MS. SHIHATA:  671.  And she also states she,

14   quote, "She had to clean it, that's what she had to

15   clean."  She also said that Maria, and I'm only focusing

16   on this because you mentioned Otis Delacruz, but Otis

17   testified that Maria would ask her in fact on the

18   weekends whether she could go down to clean with her and

19   Otis told her no, I have visits on the weekend, I'm not

20   going.

21          THE COURT:  I don't know that it was every

22   weekend but I do remember that.

23          MS. SHIHATA:  And the reason --

24          THE COURT:  But there's also testimony that on

25   the last time somebody said do you want me to go and she

54

Proceedings

1  said no.

2          MS. SHIHATA:  Yes.  And there was also an

3  explanation from Yolanda that that was in the context of

4  Maria was leaving the MDC shortly and she specifically

5  warned Yolanda don't go to the second floor.  I think a

6  reasonable inference from that testimony, from Yolanda's

7  testimony, is that Maria was warning Yolanda, because she

8  didn't want the same thing to start happening to her.

9  Yolanda was also a young attractive Spanish female at the

10  MDC.

11          Now these are certainly inferences that can be

12  drawn from the evidence and --

13          THE COURT:  Could you just wait one second?

14  Sure.  I honestly don't see on page 671 where that deals

15  with the question that I asked.

16          MS. SHIHATA:  I don't have the transcript in

17  front of me.  I had that note.

18          THE COURT:  I tried and I may have missed it

19  but --

20          MS. SHIHATA:  No, I understand, but I don't

21  want to --

22          THE COURT:  When it went into the jury, they

23  said this were the pages that are responsive to your

24  note.  And I said why don't we attach the pages and

25  somebody said well they already have the transcript.  But

Proceedings

1   the pages were specifically -- the record reflects that

2   the pages that were sent in to the jury.  All I'm saying

3   is is that it was unclear to me from the pages that went

4   in as to whether or not this was voluntary.

5            MS. SHIHATA:  So we submit that it was not

6   and --

7            THE COURT:  I know, but you can only submit

8   what's in the record.

9            MS. SHIHATA:  Well, if I had known, Judge, that

10  this was what your Honor was going to ask me to do to re-

11  prove the entire case, perhaps I could have but --

12           THE COURT:  Look, sentencing people is very

13  serious business --

14           MS. SHIHATA:  Of course.

15           THE COURT:  -- which I take very seriously.

16  And the amount of time that it took me to read the

17  transcript, I could have tried a short case.  So you

18  know, if I read the transcript, you should read the

19  transcript.

20           MS. SHIHATA:  I have, Judge, but I have --

21  anyway, I'll move on, Judge.

22           The point is this is a serious crime and of

23  course sentencing someone is probably the most difficult

24  task that any judge has to do in their job.  The

25  government certainly understands that.  And the

56

Proceedings

1   government also understands the mitigating factors that

2   Mr. Ricco so ably mentioned.  And of course the Court

3   should also consider the other good works that Mr.

4   Martinez has done in his life.

5           But we can also not forget that this is in fact

6   a serious crime, that there is in fact a victim of this

7   crime involved here.  And this has also had a hugely

8   detrimental effect on her life.  It is not easy for

9   someone to get up on a witness stand over the course of

10  multiple days to talk about the worst experience of their

11  lives.

12          THE COURT:  I'm not sure that it was multiple

13  days.

14          MS. SHIHATA:  It was, Judge.  It was two

15  days --

16          THE COURT:  Okay, two days.

17          MS. SHIHATA:  -- in the first trial and two

18  days in the second trial.  I think you can give me that

19  that it's multiple days.

20          THE COURT:  I'm sorry.  I was concentrating on

21  the second trial.

22          MS. SHIHATA:  Okay.  Even on the second trial I

23  believe it was more than one day.

24          THE COURT:  And her testimony was really not

25  that long.  It was a thin transcript the first time.

57

Proceedings

1   Look, I don't want to get involved in how -- I think you

2   should try --

3            MS. SHIHATA:  Judge, my only point, and you may

4   disagree with it --

5            THE COURT:  I think you should try --

6            MS. SHIHATA:  -- is that it is not easy for

7   someone to testify --

8            THE COURT:  I think you should try to not get

9   carried away.

10           MS. SHIHATA:  I don't think I'm getting carried

11  away when I say --

12           THE COURT:  She was not a stranger to the

13  criminal justice system.

14           MS. SHIHATA:  Your Honor, even people convicted

15  of --

16           THE COURT:  I don't remember all of the things

17  now that Mr. Ricco alluded to.

18           MS. SHIHATA:  Your Honor --

19           THE COURT:  But she was not a stranger to the

20  criminal justice system.

21           MS. SHIHATA:  And no one claimed that she was.

22  But even people who aren't strangers to the criminal

23  justice system deserve not to be sexually abused when

24  they're serving their sentence.

25           THE COURT:  I agree with that completely.

58

Proceedings

1          MS. SHIHATA:  Okay.  Great.  I'm glad we

2    reached agreement on that.

3          THE COURT:  And in fact, as I said earlier, who

4    is going to be in the MDC to begin with?

5          MS. SHIHATA:  Which is why it makes it so

6    hard --

7          THE COURT:  People who have been charged with

8    crimes.  Not all of them have long criminal records but

9    they are people who have been charged with crimes.  I

10   agree with that.  And in part, that's what makes this a

11   serious crime because they're subject to the control of

12   guards and the overall prison personnel.

13         MS. SHIHATA:  In that regard, Judge, I also

14   would like to point out that, as your Honor knows and I'm

15   sure has read again more recently, the defendant chose to

16   testify in the second trial and that's of course his

17   right.  But also the jury's verdict make clear that he

18   lied during that testimony.  He didn't just say this was

19   consensual, which in the government's view is not what

20   happened, and also in the jury's view, but also he went a

21   step further.  He completely negated the power

22   differential that certainly exists in a prison between a

23   lieutenant and a sentenced prisoner.  He couldn't even --

24   he suggested incredibly, I'd argue, that Maria was the

25   aggressor even though she was not the one controlling the

59

Proceedings

1  cameras.  She was not the one that knew the schedules at

2  the place.  Your Honor, it is certainly a relevant factor

3  that he did not tell the truth at the trial.  It is

4  certainly a relative factor that he was a lieutenant and

5  she was a sentenced prisoner.  It is certainly a relevant

6  factor that whether the Court believes it or not, this

7  has had an effect on her life.

8          THE COURT:  It's not a question of what I

9  believe.  I don't know what effect it's had.  I'm just

10 pointing out that when you sent me a belated, you know,

11 in the middle of the night a portion of her victim impact

12 statement that you haven't sent me before, I said this

13 sounds familiar to me.  And the familiarity was that I

14 went back to the discussion we had about what happened

15 before the immigration and how she came to have a T visa

16 and she portrayed herself as having been a victim of

17 terrible sexual abuse.

18         MS. SHIHATA:  That wasn't actually her

19 testimony, Judge.  But I'm not going to belabor --

20         THE COURT:  Look, the way this came about was

21 because I think in the ordinary course there would be

22 reason to be concerned about a witness who would not

23 normally be getting a T visa.  And one of the issues I

24 suppose that one would have been concerned about was

25 whether it had anything to do with her testimony.

60

Proceedings

1          MS. SHIHATA:  It did not, Judge.

2          THE COURT:  I'm telling you the background of

3     how it came up.  And it came up.  And you persuaded Mr.

4     Ricco not to press the issue precisely because of -- he's

5     the one who was reciting what she said.  That was the

6     irony.  But you didn't dispute it.  I can get the page

7     for you if you want.

8          MS. SHIHATA:  That's fine, Judge.  One moment,

9     your Honor.  I'll conclude, your Honor, by just asking

10     the Court given the serious nature of the crime, given

11     the power differential between a lieutenant and a

12     sentenced prisoner, and also given, as the Court in our

13     view correctly determined that the need for deterrence in

14     this case --

15          THE COURT:  I'm sorry, I didn't hear what you

16     said.

17          MS. SHIHATA:  The need for deterrence of others

18     to prevent others from engaging in precisely the same

19     type of conduct which is an issue, and a serious one,

20     that the Court should consider in fashioning a sentence.

21          And with that, your Honor, we would rely on our

22     papers and submit that a sentence of time served, which

23     is essentially what the defense is asking for, is not

24     sufficient to meet the 3553(a) factors.

25          THE COURT:  What if I don't give a sentence of

61

Proceedings

1    time served?  What is?

2         MS. SHIHATA:  Your Honor, in our papers we have

3    indicated that we are seeking a sentence of 20 years

4    imprisonment.  I think that's in line with the sentence

5    that Judge Matsumoto gave in the *Perez* case.  On the

6    aggravated sexual abuse counts she --

7         THE COURT:  No, but that case is different.

8    That case involved five different inmates who were

9    subject to inappropriate --

10         MS. SHIHATA:  Yes, but even on a single count

11   she gave --

12         THE COURT:  I know, but you can't, even on a

13   single count, you don't, when you sentence somebody, you

14   don't look at it that way.

15         All right.  Do you wish to speak?  Why don't

16   you give me a minute.  I have to step out for a minute.

17         MR. RICCO:  I do too, Judge, if you don't mind.

18              (Off the record)

19         THE COURT:  Okay.  Everybody here?  Court

20   reporter ready?  Okay.  Mr. Martinez, do you wish to

21   speak?

22         THE DEFENDANT:  Judge Korman, I want to thank

23   you for allowing me to speak to you and address the

24   Court.

25         I'd like to start by saying that I'm not

62

Proceedings

1  perfect.  No one is.  I've done many good things in my

2  life but I have made a mistake of violating the trust

3  that I earned while working as a lieutenant for a moment

4  of pleasure.

5         Maria and I had a consensual affair, a secret

6  relationship that we both agreed on, and that's all it

7  was.  I did not forcibly rape or forcibly sexually

8  assault Maria.  I never forced, demanded, threatened.

9  That is not who I am or how I was raised.  She perceived

10  and treated me as someone that she was attracted to and

11  not someone of authority.

12         THE COURT:  You have to speak up.  I cannot

13  hear you.  That may be my fault.  I'm getting old, so --

14         THE DEFENDANT:  She perceived me and treated me

15  as someone who she was attracted to and not someone of

16  authority.

17         Your Honor, this was not worth the torment and

18  anguish I would endure.  It cost me everything.  The loss

19  of my mother, my career, my pension, my dignity, my honor

20  and now my mental and physical health as I have been in

21  solitary confinement for 59 months.  But I'm a man of

22  faith.  I have a strong belief in God who believes that

23  in life that good and bad things happen for a reason.

24         I have overcome adversity growing up.  I have

25  traveled to foreign land and witnessed the bombings on

63

Proceedings

1   the battlefield proudly protecting our country.  The

2   cancer I would fight years later from search, rescue, and

3   recovery at Ground Zero also protecting our country.  But

4   this right here by far has been the toughest one because

5   there's no honor here.  I have lost focus, let my guard

6   down, and I fell on my sword.  This has sent a shock not

7   only to myself but to MDC as well.

8           I have expressed my regret, since remorse, and

9   my repentance to all this has affected and I express it

10  today to everyone here.

11          Life is a journey with many unpredictable

12  elements good and bad.  Moving forward, I will continue

13  to strive for the good and that is my promise to you,

14  your Honor, for giving me a fair trial, to my children,

15  to my community, and to our country to which I proudly

16  served whenever called, through strength of my character

17  and my commitment to overcome this challenge with

18  dignity, humility, and faith.  All of my community, my

19  family and friends and former coworkers have always been

20  supportive and stood by me because they know who I am.

21          Today, your Honor, I stand alone heartbroken,

22  extremely remorseful, and have learned a lot from this.

23  I take responsibility.  I humbly ask for your mercy and

24  compassion not only for myself but for the sake of my

25  ailing grandmother, my children, grandchildren, and

64

Proceedings

1    family to ask for a second chance to right my wrong.

2              I would also like to take this opportunity to

3    thank my lawyers for their hard work and dedication and

4    not abandoning me on the battlefield.  To my aunt, there

5    are no words that can express the love and support she

6    has shown me.  I've been truly blessed for having her by

7    my side.

8              Your Honor, I thank you for your fairness for

9    allowing me to address everyone here.  Thank you.

10             THE COURT:  Mark, Mark Gjelaj is the Mark I'm

11   referring to for the record, I don't have to impose

12   separate sentence on each count, do I?  I can give one

13   sentence here?

14             MR. GJELAJ:  You would have to apply it to

15   every one of the counts though, your Honor.  Yes.

16             THE COURT:  I can't hear you.

17             MR. GJELAJ:  You would have to impose,

18   depending on what your Honor's sentence is, you would

19   have to impose whatever the sentence your Honor is

20   imposing on each and every count to run concurrent

21   depending on what the sentence is.  Now some of them have

22   maximum sentences and then you would have to sort of

23   fashion it in that way as well just to ensure that you

24   were within each of those counts, if your Honor

25   understands.

Proceedings

1          THE COURT:  I think I understand what you're

2    saying.  Could you come up here for one minute?

3                    (Pause in proceedings)

4          THE COURT:  All right.  I'm going to sentence

5    the defendant to the custody of the Attorney General for

6    a period of ten years on each count to run concurrently.

7    And I impose a special assessment, I guess it must be

8    $1,000, or I can't count?

9          THE CLERK:  1,200.

10         THE COURT:  $1,200.  And the defendant shall

11   comply with any applicable state or federal sex offender

12   registration requirements.  This is a condition that --

13   I'm sorry, I should have also said five years supervised

14   release.  The defendant shall comply as a special

15   condition of supervised release, the defendant shall

16   comply with any applicable state and/or federal sex

17   offender registration requirements as instructed by the

18   probation office, Bureau of Prisons, or any state

19   offender registration agency in the state where he

20   resides, works, or may be a student.

21         The defendant shall refrain from contacting the

22   victim of the offense unless specific permission is

23   granted by the probation department.  This means that he

24   shall not attempt to meet in person, communicate by

25   letter, telephone, email, the internet, or through a

66

Proceedings

1   third party without the knowledge and permission of the

2   probation department.

3          The defendant shall participate in a mental

4   health treatment program which may include participation

5   in a treatment program for sexual disorders as approved

6   by the U.S. Probation Department.  The defendant shall

7   contribute to the cost of such services rendered or any

8   psychotropic medications prescribed to the degree he's

9   reasonably able financially and shall cooperate in

10  securing any applicable third party payment.  The

11  defendant shall disclose all financial information and

12  documents to the probation department to assess his

13  ability to pay and his part of the treatment program for

14  sexual disorders.  I actually do not think that that is

15  required.  I don't think he has a sexual disorder.  I

16  think that's sufficient.  When I say I don't think he has

17  a sexual disorder, as I indicated earlier, he's not going

18  to go out and become a serial rapist.  This crime for

19  which he was convicted was a crime that was because he

20  was in a special position that enabled him to do it.

21          I have taken seriously into account the

22  government's position but it seems to me there are a

23  number of factors here that suggest setting aside the

24  issues that are raised about my own discomfort with the

25  verdict.  I accept, as I've often said at sentencing when

67

Proceedings

1   people have raised issues about the jury's verdict that I

2   have to accept the verdict whether I agree with it or

3   not, and I'm not sure that I disagree with it.  I

4   certainly would not quarrel that the jury could have

5   reached that verdict.  But they did acquit him of four of

6   the five most serious offenses.

7         The considerations that I've taken into

8   account, first, the life that the defendant led, his

9   military service which began at the age of 18 which he

10  served four years in a position which often involved

11  potential risk of life that in the course of while he

12  worked at the MDC he actually helped save someone's life

13  possibly at the risk of his own.

14        In addition, the defendant worked at the World

15  Trade Center after the tragedy of 9/11.  I think he

16  worked for four months.  There's of course a high cancer

17  rate of people who worked during the period.  He was part

18  of an emergency service unit for a week after the attacks

19  to do search, rescue, and recovery and thereafter he

20  volunteered for approximately four months to help clean

21  up the operation.  And you know, he does have cancer.

22  And according to the pre-sentence report and the records

23  received from the Mount Sinai World Trade Center Health

24  confirmed that the defendant is a participant in the

25  World Trade Center medical monitoring and treatment

68

Proceedings

1   program.  So those are factors that I think deserve to be

2   taken into account.

3           In addition, he did undergo two trials himself

4   and whatever difficulties that may pose to the victim, it

5   also poses to a defendant which is of course, although

6   there was no double jeopardy violation, the

7   considerations are similar to those that underlie the

8   double jeopardy clause in terms of the effect of multiple

9   trials.

10          So I take all of those factors into account.  I

11  think that the offense is a serious one, as I've said

12  during the colloquy.  I am repeating myself I know.  The

13  deterrence is not necessary to deter him from doing this

14  again because you won't, but one has to be concerned

15  about deterring people who work at the Metropolitan

16  Correction Center that conduct of this kind will not go

17  unpunished.  This was a case involving one individual,

18  whatever the circumstances were, that led to it coming to

19  pass.  I think a sentence of ten years for someone who is

20  of his age and who has potential health problems,

21  although his cancer is in remission, is a reasonable and

22  just sentence under the sentencing guidelines.

23          I'm sorry I kept you here so long.

24          MS. GEDDES:  Your Honor, will you advise the

25  defendant of his right to appeal as well?

Proceedings

1          THE COURT:  Yes.  You have the right to appeal,

2    Mr. Martinez, and if you can't afford to pay the filing

3    fee that we charge, I'll let you file the notice of

4    appeal without paying the filing fee and of course Mr.

5    Ricco can file the notice of appeal if you wish to

6    appeal.

7          MR. RICCO:  Yes, Judge.  I was going to ask on

8    behalf of the defendant that you give him in forma

9    pauperis relief as he goes forward.  Your Honor gave him

10   in forma pauperis relief at the beginning of the first

11   trial because he got the transcripts and whatnot.  He

12   has --

13         THE COURT:  I granted that.  I thought I said

14   if he can't -- I mean I thought that sort of encompassed

15   it when I say if you can't afford to pay the filing fee

16   I'll let you do it without paying the filing fee.

17         MR. RICCO:  Okay, Judge.

18         THE COURT:  But yes, I grant him leave to

19   proceed in forma pauperis.

20         MR. RICCO:  Okay.  Thank you.  The magic words

21   that the Circuit likes to hear.

22         THE COURT:  Okay.  And despite our heated

23   discussion,  I thank the government lawyers for their

24   help.  It's always useful to be challenged.

25         MS. SHIHATA:  And Judge, I apologize if I

70

Proceedings

1   overstepped.

2        THE COURT:  No, I don't mind at all.  In fact,

3   I encourage my law clerks to do it.  It helps make for a

4   better outcome when you're challenged by bright people.

5   Okay.  Thank you.

6        MR. RICCO:  So Judge, normally I would ask that

7   the Court make a recommendation that the defendant be

8   housed in the metropolitan area.  However, because of his

9   law enforcement status, his housing is problematic.  So I

10  would just ask to the extent that the Bureau of Prisons

11  can, given its other concerns, that the defendant be

12  housed in the metropolitan area as close to it as

13  possible.

14        THE COURT:  Okay.  I'm going to rely on Mark

15  Gjelaj to help me formulate this.  Where he is now is in

16  the metropolitan area.  I gather you're not enamored of

17  it.

18        MR. RICCO:  Well, it's a county detention

19  facility.

20        THE COURT:  I know.

21        MR. RICCO:  Yeah.  But he would --

22        THE COURT:  Because they're the Bureau of

23  Prisons, I assume they'd want to house him at a Bureau of

24  Prisons facility.

25        MR. RICCO:  Yeah.  They don't sentence federal

71

Proceedings

1    prisoners in Essex.  It's just a detention facility.

2            THE COURT:  Right.  I'll recommend -- if you

3    want to send me a letter with a recommendation, fine.  If

4    not, I'll work out something with Mark Gjelaj.

5            MR. RICCO:  No, that's fine, Judge.  Because of

6    his law enforcement status, they have a special protocol

7    for that.

8            THE COURT:  Well, I don't know, there are law

9    enforcement people in various federal --

10           MR. RICCO:  Yes, Judge.

11           THE COURT:  Okay.  Thank you.

12           MS. SHIHATA:  Thank you, your Honor.

13           MS. GEDDES:  Thank you, your Honor.

14                   (Matter concluded)

15                        -oOo-

16

17

18

19

20

21

22

23

24

25

72

# C E R T I F I C A T E

I, ROSALIE LOMBARDI, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **19th** day of **April**, 2022.

*Rosalie Lombardi*
**Transcriptions Plus II, Inc.**
**Rosalie Lombardi**
**AAERT# CET-656**